IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2020

## STATE OF TENNESSEE v. MICHAEL WILSON

**Appeal from the Criminal Court for Shelby County**
**No. 16-02201    Paula L. Skahan, Judge**

_____

### No. W2019-01455-CCA-R3-CD

_____

A Shelby County jury convicted the Defendant, Michael Wilson, of first degree felony murder, criminal attempt to commit second degree murder, aggravated robbery, and employing a firearm during the commission of a felony, and the trial court sentenced him to life in prison. In this appeal, the Defendant contends that the evidence is insufficient to support his convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Eric J. Montierth, Memphis, Tennessee, for the appellant, Michael Wilson.

Herbert H. Slattery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Theresa S. McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Background

This case arises from the Defendant's and co-defendant's armed robbery of the victims, Dyrell Sims and Bryant James, while the victims were sitting in the front yard of Mr. Sims's mother's home. After the Defendant and the co-defendant approached the victims in the yard, a physical altercation between the four men ensued, during which the co-defendant shot Mr. Sims; he later died from his wounds. The co-defendant took cash from Mr. Sims's pocket, along with a phone; the Defendant took cash from Mr. James. For these offenses, a Shelby County grand jury indicted the Defendant for first degree

felony murder, criminal attempt to commit first degree premeditated murder, employing a firearm during the commission of a felony, and aggravated robbery.

## A. Trial

At the Defendant's trial, the parties presented the following evidence: Dorothy Sims testified that the victim, Dyrell Sims, was her son and that he passed away on August 20, 2015. On August 18, Mr. Sims was shot outside Ms. Sims's home, and he died from his injuries. He was thirty-three years old at the time. On cross-examination, Ms. Sims testified that she was inside her home when the shots were fired, and she did not go outside until after.

Bryant James testified that Mr. Sims was his friend and that, on August 18, 2015, the two men arranged to meet at Mr. Sims's mother's house. At around 5 p.m., while it was still daylight, the two men were sitting in chairs on the front porch of the home. They observed two men standing on the corner of the street and, after about thirty minutes, the two men approached them. Mr. James described one man, whom he later identified as the Defendant, as slim and taller with a tattoo on his face and a "mouthful of gold teeth." He described the second man as short, stocky, and built "heavy," and later identified as being referred to as "Antonio." The two men told Mr. Sims and Mr. James not to move. They came onto the porch, and Mr. James testified that the two men took items out of his and Mr. Sims's pockets with the intent of robbing them and then with the intent of going inside the house to rob it as well. In an attempt to keep the men out of the house, Mr. James testified that Mr. Sims "eased off" the porch, at which point the other men followed until all four men were in the front yard of the home. Mr. James did not know either of the men who approached. Mr. James testified that he later learned it was the Defendant who approached him, and "Antonio" who approached Mr. Sims. The Defendant held Mr. James's shirt and pointed a black automatic pistol at his torso from a distance of about two inches.

At this point, Mr. Sims and "Antonio," the co-defendant, began fighting and shots were fired. Mr. James used this distraction as an opportunity to push himself away from the Defendant and flee.

Mr. James clarified that the Defendant did not take anything from him but "Antonio," the co-defendant, stole approximately eighty dollars in cash from his pocket. The co-defendant took Mr. Sims's phone and some cash from Mr. Sims.

Mr. James clarified that he saw Mr. Sims and the co-defendant "tussling," and when he saw Mr. Sims hit the co-defendant, the co-defendant fired a shot. Mr. Sims hit

2

the co-defendant again, who fired another shot in return. Mr. James stated that Mr. Sims did not have a gun. Mr. Sims was trying to prevent the co-defendant from shooting him by holding his arm and the gun down with one hand and hitting the co-defendant with the other hand. During this process, the co-defendant was firing the gun, and Mr. James observed Mr. Sims get shot twice. Mr. James observed another final shot and saw Mr. Sims fall to the ground.

Mr. James saw the Defendant and the co-defendant fleeing the scene. Mr. James identified the Defendant in the courtroom as the man who robbed him that day. He recalled that the Defendant had a tattoo on his face of a "W." Mr. James identified a photographic lineup he was shown in September of 2015 in which he identified the Defendant. He also identified the co-defendant as the man who shot and killed Mr. Sims.

Mr. James testified that both perpetrators were pointing guns at he and Mr. Sims when the men approached them on the porch.

On cross-examination, Mr. James testified that the perpetrators were on the porch with him and Mr. Sims for about a minute until they moved into the yard. He clarified that when the men talked about going inside the house, belonging to Ms. Sims, that's when Mr. Sims "eased" the group into the yard to keep them away from the house. On redirect-examination, Mr. James said that the shots fired at Mr. Sims hit him in the chest and the leg.

Officer Michael Spearman testified that he was employed by the Memphis Police Department in the Homicide Unit and investigated this crime. He testified that the Defendant became a suspect in the shooting of the victim when the police department received a "Crime Stoppers Tip." Following that development, police used the Defendant's photo in a photographic lineup which was shown to the surviving victim, Mr. James. Mr. James identified the Defendant in the photographic lineup as the person who shot Mr. Sims. He also indicated that the Defendant drove away in a black Mercedes vehicle. Based on this information, a "Be on the Lookout" alert was issued for that vehicle. The police pursued multiple additional leads but ultimately located the Defendant inside a black Mercedes and brought him in to the homicide office for questioning.

Officer Spearman testified that no weapons or shell casings were recovered from Ms. Sims's yard. On September 20, 2015, Officer Spearman and Detective Frias interviewed the Defendant after advising him of his *Miranda* rights. Ultimately the Defendant gave a statement, which he memorialized in a signed, five-page written statement; this statement was admitted into evidence. In his statement, the Defendant

stated that he knew who had murdered Mr. Sims but that the Defendant was sitting in a car around the corner when the killing occurred. Mr. Sims's killer was his cousin and who was known as "Fatman" or "Little Flinn." He told the Defendant that he committed the crime. In his statement, the Defendant described the events leading up to Mr. Sims's killing, saying that "Flinn" and another man "ran up on" Mr. Sims and Mr. James while the Defendant was sitting in the car. The Defendant heard gunshots and then saw "Flinn" and the second man run back to the car. The men told the Defendant that "Flinn" had been wrestling over a gun when "Flinn" started shooting. The Defendant stated that he was not armed with a weapon and that "Flinn" was armed with an automatic weapon. The Defendant denied firing a gun. He stated that he was the driver of the black Mercedes. Following his statement, the Defendant identified a photo of "Flinn." Officer Spearman identified the Defendant in the courtroom and pointed out the unique "W" tattoo under the Defendant's right eye.

On cross-examination, Officer Spearman testified that there were multiple leads generated by the police department but none of them resulted in the identification of a suspect. The tip that a black Mercedes had been involved lead officers to pursue other vehicles of the same type but ultimately the only credible link to the crime was the vehicle driven by the Defendant.

Dr. Marco Ross testified that he was employed as a forensic pathologist and was also serving as the interim chief medical examiner at the West Tennessee Regional Forensic Center. Dr. Ross was qualified as an expert by the trial court in the field of forensic pathology. Dr. Ross was shown photographs of Mr. Sims's deceased body, and Dr. Ross identified the gunshot wounds visible on Mr. Sims's body. There were five total gunshot wounds on Mr. Sims's body including one to Mr. Sims's head, which Dr. Ross testified was fatal. He testified that the cause of Mr. Sims's death was multiple gunshot wounds.

Based upon this evidence, the jury convicted the Defendant of first degree felony murder, criminal attempt to commit second degree murder, aggravated robbery, and employing a firearm during the commission of a felony. The trial court ordered the Defendant to serve life in prison. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his convictions. He argues that Mr. James's testimony is inconsistent and lacks credibility, making it impossible for a jury to convict him beyond a reasonable doubt of these crimes.

He does not dispute that a robbery occurred or that Mr. Sims was shot and killed during the perpetration of the robbery. The Defendant argues that Mr. James's inconsistencies cast doubt on his role or responsibility for all the events that took place. The State responds that the evidence is sufficient to support the convictions and that the Defendant has not identified any significant inconsistencies which would render Mr. James's testimony not credible. The State points out that credibility is an issue for the jury to decide and that Mr. James's testimony alone, if deemed credible by a jury, is sufficient to support the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2014). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. T.C.A. § 39-13-202(b). "Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). "To establish that a defendant committed a second degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." *State v. Parker*, 350 S.W.3d 883, 904 (Tenn. 2011). Criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a)(1)-(3).

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and is accomplished with a deadly weapon. T.C.A. § 39-13-401 and § 39-13-402(a)(1). A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103(a). It is also an offense "to employ a firearm during the . . . [c]omission of a dangerous felony." T.C.A. § 39-17-1324(b)(1) (2014). Attempt to commit second degree murder is a dangerous felony. *See* T.C.A. § 39-17-1324(i)(1)(B).

The evidence, considered in the light most favorable to the State, showed that the Defendant and his co-defendant, each wielding a deadly weapon, approached the victims on the front porch of a residence. An altercation between the four men ensued in the front yard of the residence, during which time the Defendant pointed an automatic pistol at Mr. James. While brandishing his weapon, the co-defendant took cash from each victim and a cell phone from the second victim, Mr. Sims. When Mr. Sims, who was unarmed, attempted to defend himself, the co-defendant fired five shots, all of which struck Mr. Sims. Mr. Sims later died from his gunshot wounds. This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that the Defendant and the co-defendant committed an aggravated robbery, while employing a deadly weapon, during the perpetration of which the victim was murdered. The evidence is also sufficient to support a jury's determination that the Defendant acted with the intent to bring about the result of the victim's death. Accordingly, the evidence is sufficient to support the Defendant's convictions.

As to his argument that Mr. James's testimony contained inconsistencies which cast doubt on his identity and role in the killing, we point out that all inconsistencies in a witness's testimony are resolved by the jury through its verdict. *See Bland*, 958 S.W.2d at 659; *Liakas*, 286 S.W.2d at 859. The Defendant states that "to reconcile [Mr. James's] testimony, a jury has to believe him even when he gives confusing and diverging accounts of what happened." It is the within province of the jury, indeed it is the role of the jury, to make factual determinations about the evidence in light of any inconsistencies which may arise within the trial, and we are forbidden from re-evaluating or re-weighing

7

the evidence on appeal. *See Matthews*, 805 S.W.2d at 779. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE